# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

|  |  |  |
|---|---|---|
| _____ | * | |
| | * | |
| Nos. 05-2064 & 06-1944 | * | |
| _____ | * | |
| | * | |
| K.C. 1986 Limited Partnership, | * | |
| | * | |
| Plaintiff-Appellant, | * | |
| | * | |
| v. | * | |
| | * | |
| Reade Manufacturing, A Division of | * | Appeals from the United States |
| Reactive Metals & Alloys Corp.; | * | District Court for the |
| Reactive Metals & Alloys Corp., | * | Western District of Missouri. |
| | * | |
| Defendants, | * | |
| | * | [PUBLISHED] |
| U.S. Borax, Inc., | * | |
| | * | |
| Defendant-Appellee, | * | |
| | * | |
| Hardee's Food Systems, Inc.; | * | |
| Terracon Environmental, Inc., | * | |
| | * | |
| Defendants. | * | |
| | * | |
| --------------------- | * | |
| | * | |
| Nancy Reade Forster, As the Personal | * | |
| Representative of the Estate of | * | |
| Charles F. Reade, | * | |
| | * | |
| Third-Party Plaintiff, | * | |
| | * | |
| U.S. Borax, Inc., | * | |

|  |  |
|---|---|
|  | * |
| Third-Party Plaintiff-<br>Appellee, | * |
|  | * |
|  | * |
| v. | * |
|  | * |
| DeAngelo Brothers, Inc., DEH<br>Merrywood Company; Habco<br>International, Inc., | * |
|  | * |
|  | * |
|  | * |
| Third-Party Defendants, | * |
|  | * |
| Victor Horne, | * |
|  | * |
| Third-Party Defendant-<br>Appellant, | * |
|  | * |
|  | * |
| Habco, Inc., | * |
|  | * |
| Third-Party Defendant, | * |
|  | * |
| Donald E. Horne, | * |
|  | * |
| Third-Party Defendant-<br>Appellant, | * |
|  | * |
|  | * |
| Donald E. Boatright, | * |
|  | * |
| Third-Party Defendant. | * |
|  |  |
| _____ | * |
|  | * |
| No. 05-2068 | * |
| _____ | * |
|  | * |
| K.C. 1986 Limited Partnership, | * |
|  | * |

Plaintiff,                                    *
                                              *
        v.                                    *
                                              *
Reade Manufacturing, A Division of            *
Reactive Metals & Alloys Corp.;               *
Reactive Metals & Alloys Corp.,               *
                                              *
        Defendants,                           *
                                              *
U.S. Borax, Inc.,                             *
                                              *
        Defendant-Appellee,                   *
                                              *
Hardee's Food Systems, Inc.;                  *
Terracon Environmental, Inc.,                 *
                                              *
        Defendants.                           *
                                              *
------------------------                      *
                                              *
Nancy Reade Forster, As the Personal          *
Representative of the Estate of               *
Charles F. Reade,                             *
                                              *
        Third-Party Plaintiff,               *
                                              *
U.S. Borax, Inc.,                             *
                                              *
        Third-Party Plaintiff-               *
        Appellee,                             *
                                              *
        v.                                    *
                                              *
DeAngelo Brothers, Inc.,                      *
                                              *
        Third-Party Defendant -              *
        Appellant,                            *

-3-

|   |   |
|---|---|
| | * |
| DEH Merrywood Company; Habco | * |
| International, Inc.; Victor Horne; | * |
| HABCO, Inc.; Donald E. Horne; | * |
| Donald E. Boatright, | * |
| | * |
| Third-Party Defendants. | * |

_____

Submitted: January 11, 2006
Filed: January 4, 2007
_____

Before MURPHY, HANSEN, and SMITH, Circuit Judges.
_____

HANSEN, Circuit Judge.

These consolidated appeals arise out of a contribution action brought pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601-9675. The final judgment requires Donald E. Horne, Victor Horne, K.C. 1986 Limited Partnership (K.C. 1986) (collectively the Horne Appellants), and DeAngelo Brothers, Inc. (DeAngelo) to pay U.S. Borax, Inc. (Borax) 90% of the past response costs incurred by Borax and to be responsible for 90% collectively of the future response costs to clean up a superfund site in North Kansas City, Missouri, known as the Armour Road Superfund Site (the Site). We affirm in part and reverse and remand in part.

I.

The Armour Road Superfund Site has two owners. A portion of the Site has been owned or leased at all relevant times by the Burlington Northern and Santa Fe Railway Company (BNSF) or its predecessor railroads, most notably the Chicago,

Burlington & Quincy (CB&Q). The remainder of the Site, the property at 2251 Armour Road in North Kansas City, Missouri, has been owned or leased by a series of companies that manufactured, formulated, and blended herbicides on the property for more than 55 years. The leasehold and ownership list for this property can be divided into the Reade Era (1929-1963), the Borax Era (1963-1968), the Habco Era (1968-1986), and the K.C. 1986 Era (1986-present).

As early as 1929, the Reade Manufacturing Company (Reade) conducted herbicide blending and packaging operations at 2251 Armour Road using substantial amounts of arsenic, among other hazardous chemicals, and offering herbicide spraying services to railroad companies across the country, including the BNSF and its predecessors. The Site was significantly contaminated by arsenic during the Reade Era.

From 1963 to 1968, Borax leased the property from Reade. Borax continued to operate a herbicide blending facility there, and additional arsenic contamination occurred at the Site.

In 1968, Habco, Inc. (Habco) purchased the property. Habco was first jointly owned by Donald Boatright and Donald Horne until 1976 and then owned principally by Donald Horne thereafter. Habco's plant manager was Donald Horne's brother, Victor. Victor was responsible for implementing Donald's decisions but was not authorized to make decisions involving substantial amounts of money absent Donald's approval. Like Reade and Borax, Habco mixed and repackaged herbicides at the property, using large volumes of hazardous substances including arsenic, and provided spraying services to railroad companies until 1986. Spills of both granular and liquid chemicals that periodically occurred were not properly collected or disposed. Habco used in-ground mixing vats to blend chemicals and above-ground storage tanks to store chemicals. Over the years, with Donald Horne's approval, Habco removed all but one of the above-ground storage tanks. Donald also authorized an in-ground vat

to be drained and backfilled rather than removed because filling it in was cheaper, and he was fearful of what lay beneath it if it were removed. Victor oversaw the project. In 1973, the company settled a lawsuit brought by a neighboring green house alleging that its plants were damaged by herbicide contamination caused by Habco. When Habco transferred the real estate in 1986, only one above-ground tank and two of the three in-ground mixing vats remained.

In 1986, Habco, after deciding to dissolve, sold all of its operating assets (except for the Armour Road real property) to a new company named Habco-Loram, Inc., for approximately $2.6 million. Donald Horne was not a stockholder or a director of Habco-Loram. Habco-Loram paid the purchase price partly in cash ($500,000) and partly by giving Habco its promissory notes secured by the granting of a security interest in certain of its assets to Habco. When Habco dissolved as a corporation, it distributed the notes (and the accompanying security interest) among Habco's shareholders. Donald Horne was the principal stockholder in Habco with approximately 93% of its stock, and he later acquired the other stockholders' (by then noteholders') interests as well. Donald Horne signed a three-year employment agreement with Habco-Loram and served as its president for one year. Habco-Loram's operations, employees, customers, and contracts were essentially identical to what Habco's had been, but it moved its business to a different location. In 1988, two years after its origin, Habco-Loram, apparently unable to meet its obligations, agreed to convey all of the pledged assets to Donald Horne as part of a voluntary foreclosure and in satisfaction of its notes. Donald Horne then formed Habco International, Inc., of which he was the sole stockholder, officer, and director, and using the assets conveyed to him and to his new corporation from Habco-Loram, continued the business operations that Habco-Loram had conducted, which were substantially the same operations conducted by the original Habco, except that Habco International, like Habco-Loram before it, did not own, lease, or use the Site for its herbicide formulation and spraying business.

On March 19, 1997, Neal and Paul DeAngelo, as individuals, purchased the stock of Habco International. Habco International continued its same operations. In October 1998, Habco International merged into DeAngelo Brothers, Inc. (DeAngelo), in accordance with Pennsylvania's corporate merger statute by which DeAngelo took all of Habco International's assets and liabilities. By that time, the district court had determined that Habco International was a successor corporation to Habco for the purposes of this litigation. The district court later concluded that DeAngelo was a successor corporation to Habco International and to Habco.

At the same time that it was selling its operating assets to Habco-Loram, the Board of Directors of Habco agreed to transfer the Armour Road real estate to K.C. 1986 Limited Partnership, a holding company formed by Donald Horne for the express purpose of taking title to the property as its only asset. K.C. 1986 is still the current owner of the real estate. When Habco dissolved, its 99% interest as the limited partner in K.C. 1986 was distributed among Habco's shareholders. Eventually, Donald Horne as an individual acquired all of the 99% limited partner interest in K.C. 1986, and he still holds that interest. The remaining 1% interest is owned by DEH Merrywood Corporation, formed by Donald Horne solely to act as the general partner of K.C. 1986. He is the sole shareholder, officer, and director of DEH Merrywood, and as such, he retains full and exclusive decision-making authority over the management and control of the property. Donald Horne was aware that leftover herbicides remained on the property, but the property has not been actively used for herbicide manufacturing or blending since 1986.

K.C. 1986 immediately sought potential buyers and lessees for the property. Hardees, a prospective lessee, hired Terracon Consultants to perform environmental testing at 2251 Armour Road. Terracon observed an above-ground storage tank at the site that still contained a liquid material, but when it returned for continued assessment, the tank was gone and a large spill had occurred from the removed tank. Donald Horne had authorized the tank's removal. Testing of the spill area revealed

-7-

heavy concentrations of hazardous substances including arsenic. Terracon notified K.C. 1986 in the fall of 1989 that test results indicated the property was contaminated, but Donald Horne did not report the contamination to the Missouri Department of Natural Resources (MDNR).

In 1991, the State of Missouri learned from Terracon that the soil and groundwater at the Site were heavily contaminated with hazardous substances, including arsenic. The EPA became involved and declared it a superfund site. The dispute involving the cleanup of the Site was first brought to federal district court in 1993 by K.C. 1986. That case was dismissed by a stipulation without prejudice in 1998 pending an administrative determination of how best to remedy the contamination.

K.C. 1986 filed the current CERCLA litigation in 2002, seeking a determination of liability for the cleanup costs between and among the various parties. Borax admitted CERCLA liability but filed cross-claims and counterclaims for contribution pursuant to CERCLA, 42 U.S.C. § 9613(f), seeking reimbursement for the cleanup costs it had already incurred as well as future costs. It was undisputed that substantial additional future response costs will be incurred to clean up the site.

The district court issued an order on May 7, 2004, granting and denying various summary judgment motions related to liability. Following a bench trial, the district court entered an Allocation Order on January 7, 2005. The court considered several equitable factors in determining how best to allocate the response costs, acknowledging the difficulty of determining exactly how each party either increased or decreased the actual contamination at the Site. The district court found that "[t]he Site was so contaminated during the Reade Era that the remediation plan approved by the EPA would have been required even if Habco, Borax, K.C. 1986, and the Hornes had never set foot on the property. On the other hand, each of these parties substantially contributed to the contamination of the Site by their own independent

-8-

actions." (Horne Appellants' Add. at A-87.) The district court allocated responsibility for the $1,160,673.17[1] of response costs incurred by Borax as of March 1, 2004, as well as any future response costs, in the following proportions: Donald Horne–40%; K.C. 1986–20%; Victor Horne–15%; DeAngelo–15%; and Borax–10%. The district court also awarded prejudgment interest to Borax, but Borax had not yet submitted the documentation necessary to calculate the interest. The Allocation Order stated that it was not the final judgment in the case and that final judgment would be entered when the prejudgment interest calculation was complete.

Prior to the entry of the final judgment, Donald and Victor Horne, K.C. 1986, and DeAngelo requested the district court to amend the Allocation Order by applying pretrial settlements as credits to offset the judgment and preclude any prejudgment interest award, because the $1,160,673.17 total of Borax's response costs did not reflect the fact that Borax had obtained pretrial settlements from other parties in amounts that had been either paid or promised to Borax. The district court denied the motion to amend in a final order dated April 4, 2005, concluding that the parties had failed to bring the settlement credits to the court's attention in a timely fashion. Additionally, the district court awarded Borax $98,664.36 in prejudgment interest.

The Horne Appellants assert on appeal that the district court erred by (1) refusing to apply the settlement credits to the final judgment, (2) awarding prejudgment interest to Borax, (3) finding that Donald Horne had knowledge of contamination prior to 1986, and (4) entering summary judgment against Donald

---

[1]Due to an error in Borax's calculation of costs incurred, the Allocation Order lists a slightly different amount of $1,164,597.62. There is no dispute that this amount was due to a mistaken calculation by Borax and that the correct response cost total as of March 1, 2004, is $1,160,673.17. The district court corrected its Allocation Order to reflect this in an amended judgment filed on March 31, 2006. Because the appeal of the corrected judgment (No. 06-1944) involves issues identical to those identified in the appeals of the Allocation Order (Nos. 05-2068 and 05-2064), we consolidated all three in this appeal.

Horne on the issue of operator liability during the Habco Era. DeAngelo appeals, arguing that the district court erred in neglecting to specify that no recovery from DeAngelo would be permitted until all other sources were exhausted and in finding that Habco International is liable as Habco's successor in interest.

## II.
### A. The Horne Appellants' Arguments
#### 1. Settlement Credits

We first consider whether the district court abused its discretion in refusing to amend the Allocation Order before final judgment was entered to credit the pretrial settlements obtained by Borax from the EPA and private entities against the judgment. The district court refused even to consider the issue, concluding that it was untimely raised in a motion for reconsideration after entry of the Allocation Order. We agree that the issue should have been presented to the district court in a more timely matter. Nevertheless, we conclude that the district court abused its discretion by refusing to consider the settlement credits issue because CERCLA requires such consideration, and final judgment had not yet been entered.

There is no question that a Federal Rule of Civil Procedure 59(e) motion to alter or amend the judgment may not be used to raise for the first time arguments or issues that could and should have been made to the district court prior to the entry of final judgment. Bannister v. Armontrout, 4 F.3d 1434, 1440 (8th Cir. 1993), cert. denied, 513 U.S. 960 (1994). The district court expressly provided in the Allocation Order, however, that "this Order does not constitute final judgment in this case; final judgment will be made once the Court has awarded Borax the prejudgment interest to which it is entitled." (Horne Appellants' Add. at A-98.) The district court left the record open to receive additional evidence regarding prejudgment interest. See Dieser v. Cont'l Cas. Co., 440 F.3d 920, 924 (8th Cir. 2006) (noting that an order which expressly left unresolved the amount of prejudgment interest and called for further

submissions from the parties to determine the method of calculation and the amount of prejudgment interest could not reasonably be believed to be a final order).

Instead, the Horne Appellants' motion to amend purported to be brought pursuant to Rule 54(b), which provides that when fewer than all claims are resolved, the district "court may direct the entry of a final judgment as to one or more" claims or parties, but in the absence of such a direction, any other form of decision "which adjudicates fewer than all the claims . . . is subject to revision at any time before the entry of [final] judgment." "The district court has the inherent power to reconsider and modify an interlocutory order any time prior to the entry of judgment." Murr Plumbing, Inc. v. Scherer Bros. Fin. Servs. Co., 48 F.3d 1066, 1070 (8th Cir. 1995).

Construing the motion to amend the Allocation Order in light of Rule 54(b) and the district court's inherent power, we review for an abuse of discretion the district court's refusal to consider the Horne Appellants' arguments regarding the settlement credits. See Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP, 322 F.3d 147, 167 (2d Cir. 2003) (reviewing for abuse of discretion the district court's denial of a Rule 54(b) motion to reconsider an interlocutory order). The abuse of discretion standard dictates that we consider whether the district court (1) failed to consider "a relevant factor that should have been given significant weight;" (2) considered and gave significant weight to "an irrelevant or improper factor;" or (3) considered "all proper factors, and no improper ones," but in weighing those factors, committed a "clear error of judgment." Kern v. TXO Prod. Corp., 738 F.2d 968, 970 (8th Cir. 1984). By failing to consider the effect of the settlements as required by CERCLA, the district court failed to consider a relevant factor that should have been given significant weight. CERCLA provides that a judicially approved government settlement, such as Borax's settlement with the EPA, "does not discharge any of the other potentially liable persons unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement." 42 U.S.C. § 9613(f)(2). The district court was aware of and had approved the government

settlement prior to March 1, 2004, and therefore abused its discretion by refusing to take the government settlement into consideration in the allocation determination to reduce the potential liability of the other responsible parties.

The private party settlements, including Borax's settlement with the BNSF, were also relevant to the allocation determination. Although § 9613(f)(2) governs only the effect of settlements with the government, not private parties, general equitable principles remain in play. In resolving contribution claims in general, CERCLA directs the court to "allocate response costs among liable parties using such equitable factors as the court determines are appropriate." Id. § 9613(f)(1). In determining which equitable factors are appropriate, the policies articulated in CERCLA cannot be ignored. Importantly, CERCLA articulates a policy against double recovery. See 42 U.S.C. § 9614(b) (prohibiting duplicate recovery for the same removal costs). Crediting the amount of the settlements reached with private parties is necessary to avoid double recovery by one party. The district court was aware that pretrial settlements had occurred as it granted dismissals of the settling parties based on those settlements. Additionally, crediting the settlements reached prior to trial against the judgment for response costs incurred prior to March 1, 2004, would not require the revision of any findings or conclusions made in the Allocation Order, only a recalculation of the amount of the judgment. Accord Azko Nobel Coatings, Inc. v. Aigner Corp., 197 F.3d 302, 308 (7th Cir. 1999) (requiring district court on remand to determine how much was collected in settlements and adjust the judgment accordingly). CERCLA plainly requires that the district court take these settlements into its equitable consideration in the allocation process. The district court neither credited the settlements against the judgment nor articulated an equitable reason for not doing so other than the timeliness of the request. We conclude that the request was not so untimely in this case so as to override CERCLA's policy against permitting a double recovery. While the appellants would have been well advised to raise such issues in the most expedient manner, the district court could not have been surprised by the existence of settlements in this case. Because the settlement credits

present a significant allocation factor under CERCLA and the issue was raised prior to the entry of a final judgment, the district court should have exercised its discretion to consider them when calculating the amount of the judgment. We vacate the monetary judgment and remand the case for the district court to consider in the first instance the issue of offsetting the judgment with settlement credits.[2]

## 2. Prejudgment Interest

The Horne Appellants also challenge the district court's award of prejudgment interest. Our decision to remand for consideration of settlement credits may result in the district court's need to reconsider and to recalculate the prejudgment interest award. However, while the interest amount may necessarily be recalculated in the light of any settlement credits the district court determines appropriate, we conclude that the district court did not abuse its discretion in determining that any prejudgment interest awarded will accrue from the dates of the demands made in Borax's Rule 26 disclosures and third-party complaints.

"An award of prejudgment interest – whether in a joint and several liability action under § 107 or a contribution action under § 113 of CERCLA – is mandatory . . . ." GenCorp Inc. v. Olin Corp., 390 F.3d 433, 450 (6th Cir. 2004), cert. denied, 126 S. Ct. 420 (2005); 42 U.S.C. § 9607(a)(4) (stating that "[t]he amounts recoverable in an action under this section shall include interest on the amounts recoverable") (emphasis added); see also Bancamerica Comm. Corp. v. Mosher Steel of Kansas City, 100 F.3d 792, 801 (10th Cir.), as amended, 103 F.3d 80 (1996). Prejudgment

---

[2]We grant Borax's motion to strike portions of the Horne Appellants' Reply Brief wherein they assert a new argument that Borax's past response costs are not recoverable in light of Cooper Indus. v. Aviall Servs., Inc., 543 U.S. 157 (2004). "It is well settled that we do not consider arguments raised for the first time in a reply brief." Navarijo-Barrios v. Ashcroft, 322 F.3d 561, 564 n.1 (8th Cir. 2003). Additionally, we deny Borax's motion to supplement the record.

interest "shall accrue from the later of (i) the date payment of a specified amount is demanded in writing, or (ii) the date of the expenditure concerned." 42 U.S.C. § 9607(A)(4). We review the district court's decision on prejudgment interest for an abuse of discretion. See Bancamerica Comm., 100 F.3d at 801 (holding district court abused its discretion in concluding that the third amended complaint did not meet the demand requirements where it asserted response costs in excess of $1 million against two defendants).

We respectfully reject the Horne Appellants' assertion that neither Borax's third-party complaints nor its Rule 26 disclosures were specific enough to meet the statutory requirement for the accrual of prejudgment interest. Relying on United States v. Consolidation Coal Co., they assert that the written demands were insufficient because Borax did not demand specific amounts from each defendant. 345 F.3d 409, 416 (6th Cir. 2003) (rejecting a third-party complaint as not a sufficiently specific written demand where it alleged damages of "over $47 million" against 59 third-party defendants, as well as various unidentified parties, and did not specify the amount demanded from each defendant). We conclude that their reliance on Consolidation Coal Co. is misplaced. The case before us involves only a handful of third-party defendants, most of which are related in some way to each other. The district court noted that Borax named specific amounts in the third-party complaints and the Rule 26 disclosures. (See Appellants' App. at 256-57.) While these demands did not separate out the specific amounts sought from each third-party defendant, the district court stated that there is no question that "the parties in this case had full knowledge of their contaminating activities which gave rise to the response costs." (Id. at 257.) The degree of specificity the Horne Appellants would require can only be achieved in this case after liability has been proven and an allocation order entered. See Bancamerica Comm. Corp., 100 F.3d at 802 (noting that "it may be impossible for parties to provide accurate calculations prior to the court's allocation of response cost liability" and that "[t]he district court has considerable discretion in apportioning equitable shares of response costs") (internal marks omitted). On this record, we

conclude that the district court did not abuse its discretion in concluding that these demands were sufficiently specific to put the parties on notice of the amounts at issue and the accrual of prejudgment interest.

We therefore remand the prejudgment interest issue for potential recalculation by the district court, but we find no abuse of discretion in the district court's determination of the prejudgment interest accrual dates.

### 3. Donald Horne's Knowledge

The Horne Appellants argue that the district court clearly erred in finding that "Donald Horne was well-aware that the Site was contaminated long before he formed K.C. 1986 to purchase the Site." (Horne Appellants' Add. at A-62.) We review the district court's fact-findings for clear error. United States v. Gurley, 43 F.3d 1188, 1194 (8th Cir. 1994) (citing Fed. R. Civ. P. 52(a)), cert. denied, 516 U.S. 817 (1995). We see no clear error. While there is no direct evidence of Donald Horne's knowledge, the district court as fact finder was free to rely upon circumstantial evidence to establish knowledge. See Coleman v. Parkman, 349 F.3d 534, 538 (8th Cir. 2003) ("But, like always, a plaintiff can prove knowledge through circumstantial evidence."). The finding that Donald Horne was aware of contamination at the Site prior to 1986 was a reasonable inference drawn from all of the evidence, and the district court supported this finding with eight specific facts from the record. (See Horne Appellants' Add. at A-62-64.) Further, the district court's allocation decision did not turn on the sole question of whether Donald Horne had actual knowledge of contamination prior to 1986. Rather, his share of the response costs also reflected equitable factors such as his exercise of control over the hazardous substances and his subsequent reluctance to cooperate with the cleanup effort. We see no clear error in the fact-findings regarding Donald Horne's knowledge.

## 4. Donald Horne's Operator Liability

The Horne Appellants argue that the district court erred in its summary judgment ruling that Donald Horne was liable as an operator during the Habco Era, from 1968 to 1986. We review de novo a district court's grant of summary judgment, viewing the record in the light most favorable to the nonmoving party. McClure v. Career Sys. Dev. Corp., 447 F.3d 1133, 1135 (8th Cir. 2006). Summary judgment is proper only if the evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

"Liability for the release of hazardous substances may be imposed on 'any person who at the time of disposal of any hazardous substance *owned or operated* any facility at which such hazardous substances were disposed of.'" Gurley, 43 F.3d at 1192 (quoting 42 U.S.C. § 9607(a)(2)). When considering an individual's liability as an operator, "'[i]t is the authority to control the handling and disposal of hazardous substances that is critical under the statutory scheme.'" Id. (quoting United States v. Ne. Pharm. & Chem. Co., 810 F.2d 726, 743 (8th Cir. 1986)). We have held that an individual may be liable as an operator if he "(1) had authority to determine whether hazardous wastes would be disposed of and to determine the method of disposal and (2) actually exercised that authority, either by personally performing the tasks necessary to dispose of the hazardous wastes or by directing others to perform those tasks." Id. at 1193. "[U]nder CERCLA, an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility," as long as this management includes "operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." United States v. Bestfoods, 524 U.S. 51, 66-67 (1998).

The district court stated that the defendants had conceded that Donald Horne was "directly responsible for devising the procedures for the use and disposal of hazardous waste, as well as for directing Victor Horne to carry out those procedures." (Horne Appellants' Add. at A-36.) The summary judgment record indicated that Donald Horne did not dispute that his approval was necessary for any decisions involving large expenditures, that he had approved procedures such as rinsing out truck tanks containing herbicides, and that he was responsible for making decisions regarding compliance with environmental laws. The undisputed facts support the district court's conclusion that Donald Horne is liable as an operator of the facility, including those operations having to do with the leakage or disposal of hazardous waste and decisions about complying with environmental regulations. See Bestfoods, 524 U.S. at 66-67.

## B. DeAngelo's Arguments
### 1. Habco International's Successor Liability

DeAngelo challenges the district court's conclusion that it is liable under CERCLA as a successor corporation to Habco. The district court's September 10, 1997, summary judgment ruling from the bench concluded that Habco International was liable as a successor corporation to Habco, despite Habco-Loram's intervening purchase and ownership of the operating assets of Habco. Subsequent to that ruling holding Habco International liable, DeAngelo merged with Habco International, assuming all of its liabilities, and Borax sought summary judgment in the current proceedings against DeAngelo, as a successor to Habco International. In the district court's May 7, 2004, summary judgment ruling on DeAngelo's liability, the district court refused to reconsider its 1997 ruling on Habco International's liability because DeAngelo had raised no new arguments. On the basis of that prior ruling, the district court then held DeAngelo liable as a successor corporation to Habco because it had merged with Habco International.

We review the district court's summary judgment ruling de novo, applying the same standard as the district court. Dico, Inc. v. Amoco Oil Co., 340 F.3d 525, 528-29 (8th Cir. 2003). Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Id. at 529; Fed. R. Civ. P. 56(c). The traditional common law rule of corporate successor liability applicable in most states provides that where one corporation purchases the assets of another, the purchasing or successor corporation takes free of the liabilities of the first corporation unless one of four limited exceptions applies: (1) the successor expressly or impliedly agrees to assume the liabilities; (2) a de facto merger or consolidation occurs; (3) the successor is a mere continuation of the predecessor; or (4) the transfer to the successor corporation is a fraudulent attempt to escape liability. United States v. Mex. Feed and Seed Co., 980 F.2d 478, 487 (8th Cir. 1992); see also New York v. Nat'l Servs. Indus., 352 F.3d 682, 685 (2d Cir. 2003). The district court did not discuss the evidence in light of these traditional exceptions but instead appears to have found Habco International, and in turn DeAngelo, liable as corporate successors to Habco under the broader doctrine of "substantial continuity" articulated in Mexico Feed and Seed.

DeAngelo argues that the district court erred as a matter of law, asserting that the substantial continuity test is now invalid in light of the subsequently decided United States Supreme Court case of Bestfoods, 524 U.S. at 63 (discussing the CERCLA liability of a parent corporation for the activities of its subsidiary, and clarifying that CERCLA does not purport to rewrite well-settled rules of corporation law). While the Court in Bestfoods does not specifically address corporate successor liability under CERCLA, DeAngelo argues that Bestfoods clearly indicates that CERCLA does not authorize the federal courts to replace traditional principles of state corporation law with the federally created substantial continuity test of successor liability as stated in Mexico Feed and Seed Co.

In Mexico Feed and Seed, this court considered the applicability of the substantial continuity test in the CERCLA context, noting that the substantial continuity approach to successor liability was originally created by federal courts (including the Supreme Court) to further public policy in the context of labor law. 980 F.2d at 487-88. We concluded that, similarly, the policy objectives of CERCLA would justify imposing successor liability in appropriate cases under this broader standard by extending liability to a successor corporation which, although a bona fide purchaser, had acquired assets "*with knowledge that the wrong remains unremedied.*" Id. In the CERCLA context, this test could be applied to prevent responsible parties from evading CERCLA liability through subsequent transactions. Id. at 488. We ultimately concluded, however, that the circumstances present in Mexico Feed and Seed did not meet the substantial continuity test because the purchaser did not know of the dirty assets "and thus could not have known that its asset purchase might affect the government's ability to have the responsible parties pay the clean-up costs." Id. at 490. Thus, the purchasing corporation in Mexico Feed and Seed escaped CERCLA liability because it met neither the traditional common law exceptions to the nonliability of a purchasing successor corporation nor the broader substantial continuity test.

We acknowledge that the continuing viability of the substantial continuity theory of corporate successor liability as a creation of federal common law has been seriously questioned following the Supreme Court's pronouncement in Bestfoods that nothing in CERCLA purports to rewrite the settled rules of state corporation law simply because the cause of action is based upon a federal statute. 524 U.S. at 63. See United States v. Gen. Battery Corp., 423 F.3d 294, 309 (3d Cir. 2005) (holding "'substantial continuity' is untenable as a basis for successor liability under CERCLA"), cert. denied, 127 S. Ct. 41 (2006); Nat'l Servs. Indus., 352 F.3d at 687 (concluding that the substantial continuity doctrine is not part of traditional corporation common law and thus should not be used to determine CERCLA liability following Bestfoods); United States v. Davis, 261 F.3d 1, 54 (1st Cir. 2001) (noting

that "to justify the creation of a federal rule, there must be a specific, concrete federal policy or interest that is compromised by the application of state law") (internal marks omitted). While we may disregard the decision of another panel of this court on the basis of an intervening Supreme Court precedent that undermines or casts doubt on the earlier panel decision, see Patterson v. Tenet Healthcare, Inc., 113 F.3d 832, 838 (8th Cir. 1997) (noting a Supreme Court decision had "effectively overruled" our prior holding), we conclude it is not necessary to do so at this time. Bestfoods does not directly address corporate successor liability, and consequently, there may yet be contexts in which the substantial continuity test could survive. See Nat'l Servs. Indus., 352 F.3d at 687-88 (Leval, J., concurring). We need not decide that question today because, even assuming the test survives Bestfoods in appropriate circumstances, the facts in this record do not satisfy the substantial continuity test.

Proper application of the substantial continuity test (which is itself an offshoot of the traditional "mere continuation" test) to protect the policy concerns of CERCLA first requires a consideration of whether the successor corporation retains the same employees, the same supervisory personnel, the same production facilities in the same location, the same product, the same name, a continuity of assets and general business operations, and holds itself out as a continuation of the previous enterprise. See United States v. Carolina Transformer Co., 978 F.2d 832, 838 (4th Cir. 1992) (listing these eight factors, as well as additional concerns). Additional factors that courts consider integral to this test include whether the transfer to the successor corporation was an attempt to avoid CERCLA liability, see id., and whether the successor had knowledge of the unremedied contamination, see Mex. Feed and Seed, 980 F.2d at 488. See also Nat'l Servs. Indus., 352 F.3d at 693 (Leval, J., concurring) ("The courts' ultimate decisions whether to impose successor liability [under the substantial continuity test] have turned on additional factors involving whether failure to impose liability on the successor would undermine the objective of [CERCLA] to impose liability on responsible parties."); Atchison, Topeka & Santa Fe Ry. v. Brown & Bryant, Inc., 159 F.3d 358, 364 (9th Cir. 1998) (noting that "altering the traditional

'mere continuation' exception to encompass the broader 'substantial continuation' exception adds little in the end.  In the cases in which the broader exception has been applied to hold an asset purchaser liable, there has usually been some fraudulent intent and collusion present, in which case the purchaser would have likely already been liable under another traditional exception – the fraudulently-entered transaction exception.").  Ultimately, the proper application of the substantial continuity test requires a consideration of whether "CERCLA-defeating conduct" is present.  Nat'l Servs. Indus., 352 F.3d at 694 (Leval, J., concurring).

While not expressly considering each of the factors listed above, the district court articulated the basis for imposing successor liability on Habco International as follows:

> I am basing that decision primarily on the continuity of assets, continuation of product line, similarities in management, employees.  I am also taking into account the equitable ownership that Habco had in Habco Loram in the sense of the assets which were the major part of Habco Loram. . . . I think this is a very unique situation and it is because Habco International basically ends up with the same assets as Habco, Inc. and that Donald Horne is consistently identified in each one of these organizations either as an owner or president, having some interest.

(DeAngelo's Add. at 292-93.)  This ruling relies solely on the general continuity of the purchased business, its assets and employees, and the personal involvement of Donald Horne.  Importantly, however, with regard to one of the requirements of the substantial continuity test as it is articulated in Mexico Feed and Seed, 980 F.2d at 487-88, the district court made no finding that the purchase by Habco-Loram was an attempt to avoid CERCLA liability on the part of Habco-Loram or that Habco-Loram took the clean assets with knowledge of the unremedied contamination at the Armour Road Site.  No investigation of the Site had been previously conducted at the time Habco-Loram purchased Habco's operating assets and began to conduct its business at a different location.  In fact, the record reflects no dispute over the fact that the sale

of the operating assets from Habco to Habco-Loram was a bona fide, arm's length transaction. Borax's attorney admitted the following at the 1997 summary judgment hearing: "I don't have any evidence that there was anything tricky going on[,] that Habco Loram was anything other than an arm's-length transaction. But we don't think that is relevant." (DeAngelo's Add. at 276.) The record regarding the transaction between Habco and Habco-Loram provides no basis on which to find an intent by Habco-Loram to circumvent the purposes of CERCLA, or any knowledge of contamination on the part of Habco-Loram. Habco-Loram was not sued in this case, and Donald Horne will not escape liability for the Habco-era contamination if in fact Habco International is determined not to be a successor corporation to Habco.[3]

Borax attempts to focus our inquiry on the continuity of assets and similarity of operation between Habco and Habco International, asserting that the intervening sale to Habco-Loram is irrelevant. We respectfully disagree. The arm's length nature of the transaction between Habco and Habco-Loram severed the operating assets of the business from the contaminated real property. Habco-Loram never purchased or leased the Site but purchased only the operating assets and moved its operation elsewhere, though it did continue the business, and Donald Horne served as its president for a time. See Nat'l Servs. Indus., 352 F.3d at 693 (Leval, J., concurring) ("If a seller's CERCLA liability could be imposed on a purchaser of assets merely because it continued in substantially unchanged form the operations of the seller, the rule would result in disastrously unfair consequences, which furthermore would be harmful to the economy as a whole."). There is no evidence that Donald Horne expected those operating assets, sold to Habco-Loram for their full value of $2.6

---

[3]By contrast, the district court expressly found that Mr. Horne, who created and solely controls K.C. 1986 and DEH Merrywood, had knowledge of the unremedied contamination and refused to cooperate in the cleanup efforts. Mr. Horne and K.C. 1986 are held liable, and pursuant to the district court's ruling concerning orphan shares within an era, the Hornes will be liable for Habco's share if DeAngelo is not. (See Jan. 7, 2005, Allocation Order, DeAngelo's Add. at 248 n.7.)

million, to end up with him at some future date so that he could continue to be in the herbicide business shed of the contaminated Site and that the sale to Habco-Loram was so structured. The secured assets of Habco-Loram did not come into his hands until two years later, when Habco-Loram's business venture became unprofitable, was shutting down, and a default in payment of the notes he held was anticipated. (See Borax's App. at 3479.) Habco-Loram's unsecured assets were then transferred to the corporate entity of Habco International, without any lingering connection or reconnection to the Armour Road Site. Habco-Loram had no dirty assets to convey. Habco International never owned or operated the Site, and Donald Horne remains liable for the contaminated real property. On this undisputed record, CERCLA liability did not flow through Habco-Loram as a substantial continuation of Habco, and we will not overlook the arm's length, bona fide business transaction between Habco and Habco-Loram.

The district court expressed concern about Mr. Horne having retained an "equitable ownership" interest in Habco-Loram through his holding of the secured notes and the transfer to him and to Habco International of Habco-Loram's assets following Habco-Loram's failure. We are mindful that the present case is complicated, to say the least, by Donald Horne's renewed involvement with these assets following Habco-Loram's arm's length purchase and ultimate business failure. As Habco-Loram's asset purchase was originally structured, however, Mr. Horne had no personal equitable interest in Habco-Loram because the notes were issued to, held by, and belonged to Habco. We do not think it unusual that a seller would agree to finance and carry part of the purchase price. The notes were later distributed to Habco's four shareholders when Habco dissolved, and subsequently, when Habco-Loram failed, Mr. Horne acquired the other noteholders' interests and accepted Habco-Loram's offer to convey the secured assets to him personally (together with a $400,000 cash payment) in satisfaction of the unpaid balance on the notes that he held. As we understand the record, it is undisputed that Habco-Loram initiated the voluntary foreclosure. Borax's attorney admitted on the record at the 1997 summary judgment

hearing that Mr. Horne did not have an equity interest in Habco-Loram. (DeAngelo's Add. at 277 (the attorney also states, "we don't think that is relevant").)

Despite Donald Horne's subsequent personal re-involvement with the operating assets, we cannot say that this is a situation where a corporation was permitted "to evade [its] responsibility by dying [a] paper death[], only to rise phoenix-like from the ashes, transformed, but free of [its] former liabilities." Mex. Feed and Seed, 980 F.2d at 487. Had DeAngelo purchased the assets directly from Habco-Loram, there would be no question of CERCLA nonliability, because it is undisputed that Habco-Loram's asset purchase was an arm's length deal and no trickery was involved. The secured assets did not become magically re-entangled with the contaminated property (long since transferred to K.C. 1986) by reason of Habco-Loram's business failure. We conclude that even if the substantial continuity test survives Bestfoods, DeAngelo is not a corporate successor for CERCLA liability purposes on this record using that test.

Borax also argues that DeAngelo remains liable under the traditional exceptions for imposing successor liability. Our review of the record convinces us otherwise.[4] First, there was no express or implied agreement by Habco-Loram to assume the liabilities of Habco. (See Borax's App. at 3197 (the asset purchase agreement expressly states that "Buyer is not assuming and under no circumstances shall be

_____

[4] Because there is no assertion that the applicable state corporation law would be any different from traditional common law principles with regard to successor liability in this case, we have no occasion to decide whether CERCLA requires the displacement of state law in favor of a national rule. Compare New York v. Nat'l Serv. Indus., 460 F.3d 201, 206-09 (2d Cir. 2006) (favoring the nondisplacement of state law but concluding that resolving the issue was not necessary in that case), and Davis, 261 F.3d at 54 (applying state law provided it is not hostile to the federal interests underlying CERCLA), with Gen. Battery Corp., 423 F.3d at 298-305 (adhering to federal common law in order to preserve uniformity, and noting "that CERCLA incorporates, but does not expand upon, 'fundamental' common law principles of indirect corporate liability" (citing Bestfoods, 524 U.S. at 62-64)).

deemed to have assumed . . . any debt, liability or other obligation of the Seller of any kind").)

Second, there was no continuity of shareholders between Habco and Habco-Loram, which is a key element in determining whether there has been a de facto merger. See Gen. Battery Corp., 423 F.3d at 307 (noting de facto merger requires some continuity of ownership). There was a continuity of enterprise and employees between Habco and Habco-Loram to the extent Habco-Loram continued operating essentially the same business but at a different location, and Donald Horne was Habco-Loram's president for a time, but this factor will not carry the day for a de facto merger where there is no continuity of ownership. See id. at 306 (noting "continuity of shareholders" "is designed to identify situations where the shareholders of a seller corporation retain some ownership interest in their assets after cleansing those assets of liability"). There was no continuity of shareholders between Habco and Habco-Loram, or between Habco-Loram and Habco International. We conclude that it is inappropriate to skip over the arm's length sale of the operating assets to Habco-Loram in an attempt to stretch CERCLA liability to include Habco International.

Third, the mere continuation theory fails on this record for the reasons already articulated. See Davis, 261 F.3d at 53 (listing five traditional factors to consider in mere continuation analysis: (1) the divesting corporation's transfer of assets, (2) payment by the buyer of less than fair market value, (3) continuation by buyer of the divesting corporation's business, (4) common officer instrumental in the transfer, and (5) an inability of the divesting corporation to pay its debts after the asset transfer). Specifically, the arm's length transaction between Habco and Habco-Loram broke the chain of successor liability under this theory. See id. at 54-55 (concluding that an arm's length sale of assets precludes a finding of liability as a successor under the mere continuation test). Because Habco-Loram was not a mere continuation of Habco, it was incapable of transferring CERCLA liability to Habco International, or

DeAngelo, because Habco-Loram itself had no CERCLA liability to pass along or to share.

Finally, Borax argues that the facts fit the fraudulent transfer doctrine, but again we respectfully disagree. In Mexico Feed and Seed, we indicated that a situation where the purchasing corporation "bought only 'clean' assets, and knowingly left 'dirty' assets behind with an insufficient asset pool to cover any potential liability" would be covered by the fraudulent transaction exception. 980 F.2d at 489-90 & n.14. Additionally, "the sufficiency of the consideration given for the sale also plays a large factor in determining whether the sale was fraudulent." Atchison, Topeka & Santa Fe Ry., 159 F.3d at 365. There is no evidence in the record to indicate that Habco-Loram purchased only the clean assets while knowingly leaving the dirty assets behind with an insufficient asset pool. Borax has pointed to no evidence showing that, at the time of the sale, Habco-Loram knew of any potential CERCLA liability (let alone its extent) on the part of Habco, or that Habco's remaining assets would be so insufficient as to render it unable to satisfy its creditors. Neither is there any evidence that Habco-Loram was set up to be a sham or a pass-through entity. Further, Habco-Loram paid full consideration for the assets in an admittedly arm's length transaction.

Accordingly, we conclude that the district court erred as a matter of law in granting summary judgment against DeAngelo and holding it liable as a successor corporation to Habco. We remand for entry of judgment in accordance with this opinion and for reallocation of DeAngelo's share to the Hornes as articulated in footnote 7 of the district court's January 7, 2005, Allocation Order. (DeAngelo's Add. at 248 n.7.)

## 2. Inconsistent Orders by the District Court

DeAngelo argues that we must reconcile the inconsistency between two orders entered by the district court – in the 1997 bench order, the district court stated that it

would not permit any judgment to be pursued against Habco International until all other sources of payment of the judgment have been pursued, but then in the January 7, 2005, Allocation Order, the district court allocated 15% of all response costs to DeAngelo, as successor to Habco International and Habco, without any such limitation. Our conclusion as a matter of law that Habco International and DeAngelo are not successor corporations to Habco, and ordering reallocation of DeAngelo's share to the Hornes, renders it unnecessary to address the merits of this issue.

## III.

We reverse and remand in part for further proceedings to permit the district court to consider the application of any settlement credits against the judgment, to reconsider the prejudgment interest award based on any application of settlement credits it may see fit to make, and to reallocate DeAngelo's share to the Hornes in accordance with footnote 7 of the district court's January 7, 2005, Allocation Order. In all other respects, we affirm the judgment of the district court.

_____