# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 2, 2015          Decided August 19, 2016

No. 14-5302

LOCKHEED MARTIN CORPORATION,
APPELLEE

v.

UNITED STATES OF AMERICA,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:08-cv-01160)

———

*J. David Gunter II*, Attorney, U.S. Department of Justice, argued the cause for appellant. With him on the briefs were *John C. Cruden*, Assistant Attorney General, and *John E. Sullivan* and *Justin D. Heminger*, Attorneys.

*Dan Himmelfarb* argued the cause for appellee. With him on the brief were *Marcia G. Madsen* and *E. Brantley Webb*. *Raymond B. Ludwiszewski* entered an appearance.

*Jessica Ring Amunson* was on the brief for *amici curiae* National Defense Industrial Association and the Aerospace Industries Association of America, Inc. in support of appellee.

2

BEFORE: GARLAND,[*] *Chief Judge*, PILLARD, *Circuit Judge*, AND EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

PILLARD, *Circuit Judge*: The United States appeals its liability under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) for a portion of the cost of cleaning up hazardous substances at three California facilities owned by Lockheed Martin (Lockheed or the Company). The government's involvement at the facilities dates to the Cold War, when the Department of Defense contracted with Lockheed to build state-of-the-art, solid-propellant rockets. Lockheed's production of those rockets severely contaminated the sites, with the contamination migrating into groundwater miles away. The United States and Lockheed acknowledge their joint responsibility for the contamination. Neither party challenges the district court's percentage allocations of liability.

The parties' disagreement stems from the fact that the government has been and remains Lockheed's principal source of business, and in that capacity has agreed to allow Lockheed to charge costs incurred in cleaning up the sites—including Lockheed's own CERCLA liability—to new federal contracts unrelated to these facilities and contracts. The government, in other words, acknowledges its own share of CERCLA liability and also that it agreed to reimburse Lockheed's share via overhead charges on unrelated contracts. The only question here is whether the government has a valid claim that the particular mechanism by which the United States will pay its share of the costs of environmental remediation under CERCLA interacts

---

[*] Chief Judge Garland was a member of the panel at the time the case was argued but did not participate in this opinion.

with the parties' agreed-upon contract-based reimbursement method in a way that impermissibly requires the government to make double payment. We conclude that, in the circumstances of this appeal, the government's claims fail.

I.

A. CERCLA's Cost-Recovery and Contribution Provisions

Congress enacted CERCLA, 42 U.S.C. §§ 9601-75, in 1980 "in response to the serious environmental and health risks posed by industrial pollution." *United States v. Bestfoods*, 524 U.S. 51, 55 (1998) (citing *Exxon Corp. v. Hunt*, 475 U.S. 355, 358-59 (1986)). Congress thereby sought "to promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts [a]re borne by those responsible for the contamination." *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009) (internal quotation marks and citation omitted). The statute imposes strict liability for environmental remediation, assigning responsibility for cleaning up even pollutants disposed of according to then-acceptable practices before they were known to be hazardous.

CERCLA section 107 creates a cause of action through which entities that have incurred costs cleaning up contaminated sites may sue to recover cleanup costs from parties that may have played a role in causing the pollution, whom CERCLA refers to as potentially responsible parties (PRPs). *See United States v. Atl. Research Corp.*, 551 U.S. 128, 135-36 (2007). PRPs may include, as relevant here, owners or operators of facilities contaminated by hazardous substances, such as Lockheed, and entities that arranged for disposal or treatment of such substances. *See* 42 U.S.C. § 9607(a)(2)-(3). In this case, Lockheed filed a section 107 claim against the United States, alleging that the government played a critical role in the

activities leading to contamination of the three California sites and seeking reimbursement of a portion of the response costs Lockheed incurred at those sites.

The United States responded to Lockheed's CERCLA claim with a counterclaim under CERCLA section 113(f), *id.* § 9613(f), asserting that Lockheed was the owner and operator of the sites and had transported and arranged for disposal of hazardous wastes there. Section 113(f) authorizes courts to "allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f). Under section 113(f), a defendant seeking to avoid being assigned more than its fair share of liability in a section 107 action may "blunt any inequitable distribution of costs by filing a [section] 113(f) counterclaim" against the section 107 plaintiff. *Atl. Research Corp.*, 551 U.S. at 140. "Resolution of a [section] 113(f) counterclaim would necessitate the equitable apportionment of costs among the liable parties, including the PRP that filed the § 107(a) action." *Id.* The United States counterclaimed that its liability under CERCLA should be reduced to reflect only its proportionate responsibility for the contamination.

CERCLA also codifies in a number of provisions a general principle of avoiding double recovery of response costs. *See, e.g.*, 42 U.S.C. § 9607(f)(1) (prohibiting "double recovery under this chapter for natural resource damages"); *id.* § 9612(f) (prohibiting double recovery out of CERCLA's Superfund for any response costs); *id.* § 9613(f)(2) (reducing PRP liability for CERCLA response costs by dollar amount of settlements paid on the same matter to the state or federal government). The government here invokes CERCLA's principal double-recovery bar, which appears in section 114. Section 114(a) defines CERCLA's relationship to other law, including non-preemption

of state tort or environmental law beyond the liability CERCLA imposes, and coordination with other federal laws. Section 114(b), in turn, states that "[a]ny person who receives compensation for removal costs or damages or claims pursuant to any other Federal or State law shall be precluded from receiving compensation for the same removal costs or damages or claims as provided in this chapter." *Id.* § 9614(b). In its answer to Lockheed's section 107 complaint, the United States invoked section 114(b), contending that Lockheed's suit unlawfully sought recovery for the same removal costs the United States had already paid as overhead on contracts with Lockheed for other goods and services.

## B. Federal and Defense Agency Procurement Regulations

The second principal authority the government invokes is federal procurement law. The Federal Acquisition Regulations (FAR), 48 C.F.R. §§ 1.000-53.303, together with agency-specific acquisition regulations, *see, e.g*., *id*. §§ 201.1-253.3 (Defense FAR Supplement), govern federal government contracts for goods and services, *see id.* § 1.101. The FAR authorize two types of government contracts: fixed-price and cost-reimbursement. *See id.* § 16.101(b). For fixed-price contracts, the parties set a price based on an estimate of the total allowable costs and profits, *id*. § 16.202-1, with sharply circumscribed opportunities thereafter to adjust those estimates (and hence the contract price), *see, e.g*., *id*. § 15.407-1(b). Cost-reimbursement contracts, by contrast, set a ceiling on the government's price, and authorize payment up to that ceiling based on allowable costs the contractor incurs in performing the contract, plus profit at an agreed-upon rate. *See id*. § 16.301-1. Allowable costs under either type of contract include "direct costs," *e.g.*, material and labor, as well as "indirect costs" that comprise the company's overhead not directly related to a

specific contract. *Id.* § 31.201-1; *see also id.* §§ 31.202-.203. The FAR provide that the government may only reimburse a contractor for indirect costs that are: "allowable," *id*. § 31.201-2(a), *i.e.*, "reasonable," or of a kind that would be "incurred by a prudent person in the conduct of competitive business," *id.* § 31.201-3(a); "allocable," *i.e.*, "necessary to the overall operation of the business, although a direct relationship to any particular cost objective cannot be shown," *id*. § 31.201-4(c); and not otherwise specifically disallowed, *id*. § 31.201-6. If the contractor's cost of performance is cheaper than anticipated, the overall contract price drops only if it is a cost-reimbursement contract; if the contract is fixed-price, the contractor retains the excess.

The Defense Contract Audit Agency (DCAA) "was established to provide necessary audit services to government officers in contract administration." *Cuneo v. Schlesinger*, 484 F.2d 1086, 1088 (D.C. Cir. 1973). The DCAA in its internal Manual provides specific guidance on application of the FAR's legal limitations to environmental costs from defense contracts. *See* DEFENSE CONTRACT AUDIT AGENCY MANUAL (Dec. 12, 2012) (DCAA MANUAL). The DCAA Manual states that, if a contractor that complied with applicable law and exercised due care to avoid contamination nonetheless experiences contamination not caused by its own wrongdoing, its environmental cleanup costs may be treated as "normal business expenses." DCAA MANUAL § 7-2120.3, J.A. 493; *see id.* §§ 7-2120.1, 7-2120.5, 7-2120.13, J.A. 493-94, 497. The DCAA Manual also limits that principle: For purposes of the government's payment through defense procurement contracts, "the allowable environmental cost should only include the contractor's share of the clean-up cost based on the actual percentage of the contamination attributable to the contractor." *Id.* § 7-2120.9(a), J.A. 496. A contractor thus cannot pass

through to the government in its defense contracts any cleanup costs not attributable to the contractor under CERCLA.

Government contracting law also prohibits double charging. Where a contractor receives from another source any portion of a cost that it has already charged to the government as an indirect cost, the FAR require that the payment received for those same costs "shall be credited to the Government either as a cost reduction or by cash refund." 48 C.F.R. § 31.201-5; *see also id*. § 52.216-7(h)(2). In other words, if the government has paid a contractor a dollar in indirect costs for a specific overhead cost, the contractor must credit back to the government any portion of a dollar it otherwise receives (from another responsible party or an insurer, for example) to cover that same cost.

## C.  Factual Background

In the 1980s and 1990s, Lockheed and state and local agencies discovered hazardous substances at and emanating from three Lockheed facilities in Redlands and Beaumont, California—the Redlands facility, the Potrero Canyon facility, and the LaBorde Canyon facility (the sites or the facilities)— with the bulk of contamination located at the Redlands facility. *See Lockheed Martin Corp. v. United States* (*Lockheed II*), 35 F. Supp. 3d 92, 105-09 (D.D.C. 2014). Lockheed's corporate predecessor, Lockheed Propulsion Company, had manufactured solid-propellant rockets pursuant to government contracts at those facilities between 1954 and 1975 using myriad hazardous substances, including the organic solvents trichloroethylene and 1, 1, 1-trichloroethane, polychlorinated biphenyls (PCBs), and ammonium perchlorate. *Id.* at 99-109. To dispose of those substances, Lockheed Propulsion Company had, among other things, pumped waste into shallow, concrete-lined "evaporation pits" resulting in evaporation-pit sludge and other propellant

wastes, burned such wastes in unlined earthen "burn pits," and simply poured onto the ground toxic substances and wastewater contaminated from rinsing those substances from equipment. *Id.* at 104-05. Those operations allowed hazardous substances to seep into the ground and infiltrate nearby groundwater. *Id.* at 105-06. For example, trichloroethylene, a probable carcinogen, and perchlorate, a constituent of ammonium perchlorate known to decrease thyroid hormone production, migrated approximately four miles from the facilities to form the "Redlands plumes" of groundwater contaminants, exceeding applicable drinking-water standards for those hazardous substances. *Id.* & nn. 8-9. The government had a significant presence at the sites during rocket production, mostly conducting inspections for quality assurance and safety purposes but also acquiescing in waste disposal by Lockheed Propulsion Company employees. *Id.* at 146-51.

After discovering decades later that each facility was severely contaminated, Lockheed undertook containment and remediation measures at the three sites and their environs in compliance with orders from and consent decrees with various state and local agencies. *Id.* at 106-09. By the time of trial of the CERCLA claim against the United States in this case, Lockheed had incurred environmental response costs at the facilities of nearly $287 million and estimated that it would cost another $124 million to complete the cleanup. *Id.* at 105.

Lockheed did not ultimately bear those costs, however. Instead, as it paid cleanup costs at these and other sites over the roughly twenty years from the initiation of the cleanup to the judgment in this case, Lockheed received reimbursement by allocating cleanup costs incrementally over time as indirect contract costs charged to all of its customers. *Id.* at 109. Because the United States constitutes the vast majority of Lockheed's customer base, Lockheed had by the time of the

district court's final judgment recovered through indirect charges on its federal government contracts approximately $208 million of the total $287 million, or 72 percent, of the response costs it had thus far incurred for cleanup at the three facilities. *Id.* And, because the government's share of Lockheed's sales is now larger than it was in the past, if Lockheed were to continue charging to its contracts all costs it incurred at the sites post-judgment, the percentage of its future response costs at the three sites that Lockheed would pass through to the government, as opposed to Lockheed's other contract counterparties, would be expected to rise to about 87 percent. *Id.* at 109, 113.

When Lockheed began charging those environmental response costs to its clients, the government took the position that the FAR's cost-reimbursement provisions did not allow it to pay such costs at sites where all operations had been discontinued. Oral Arg. Rec. 3:45-3:49; Br. of Appellant United States 31. Lockheed sued the United States under the Contract Disputes Act and, in September 2000, the parties entered into the Discontinued Operations Settlement Agreement (the Billing Agreement) to resolve that payment-authority dispute. *See Lockheed II*, 35 F. Supp. 3d at 111-12; *see generally* Billing Agreement, J.A. 564-73. The Billing Agreement creates the "Discontinued Operations Pool" (DiscOps Pool), an account or "corporate overhead pool" to which the Agreement authorizes Lockheed to debit various costs it had incurred or will incur cleaning up facilities discontinued before January 2000—including but not limited to the facilities at issue here. Billing Agreement ¶ 1.8, J.A. 566.

Under the Billing Agreement, costs debited to the DiscOps Pool, called Settled DiscOps Costs, are deemed "allowable" indirect costs that may be allocated to Lockheed's business divisions, and thus charged by those divisions as overhead in

their federal government contracts. *Id.* ¶¶ 2.4-2.5, 2.8, J.A. 568-69. The Billing Agreement directs that all such costs be amortized over five years, beginning the year after Lockheed incurs the cost. *Id.* ¶ 2.17, J.A. 570. In other words, a cleanup cost Lockheed incurred in 2005 was not simply charged all at once to the contracting partners for which Lockheed happened to work the next year, but was spread across contracts during the ensuing five years. *See Lockheed II*, 35 F.Supp. at 112. The costs the Billing Agreement allows Lockheed to charge the government are wide ranging. They include traditional environmental remediation costs (for demolition, groundwater remediation, and soil remediation) as well as workers' compensation costs and even Lockheed's toxic tort settlement payments to third parties. Billing Agreement ¶ 1.8, J.A. 566-67.

The Billing Agreement contains a crediting provision under which Lockheed commits that it "shall not realize a double recovery with regard to any Settled Discontinued Operations Costs," a bar that applies equally to "past or future Settled Discontinued Operations Costs" when calculated "on a cumulative basis," and that it will "reimburse the United States for any such double recovery of Settled Discontinued Operations Costs under government contracts." *Id.* ¶ 4.7, J.A. 572. According to evidence presented at trial, Lockheed credited CERCLA recoveries it obtained in other cases to the DiscOps Pool and allocated them across all its contracts, thereby partially offsetting cleanup costs debited to the pool. *See* Trial Testimony of Robert Gatchel, Vice President of Government Finance, J.A. 448. Thus, if Lockheed recovered from other PRPs under CERCLA any of the response costs it previously had debited to the DiscOps Pool, it credited those recoveries to the DiscOps Pool (with certain exceptions not at issue here), as the Billing Agreement requires. The Billing Agreement also provides that it "does not settle claims, if any, arising under CERCLA," Billing

Agreement ¶ 4.18, J.A. 573, thereby permitting this lawsuit to proceed.

## D. Procedural History

After the United States agreed for more than a decade to toll the statute of limitations on Lockheed's CERCLA claims against it, in July 2008 Lockheed filed this section 107(a) cost-recovery action under CERCLA against the United States as a PRP. Lockheed sued to recover the government's share of the costs of cleanup at the three California facilities. The United States answered and counterclaimed for contribution under section 113(f), generally denying Lockheed's allegations and seeking equitable allocation of response costs. The government invoked CERCLA's section 114(b) double-recovery bar to oppose what it saw as Lockheed's effort to obtain from it under the Act "the same removal costs" it had already recovered from the government as contract overhead. 42 U.S.C. § 9614(b). The government also contended, more generally, that Lockheed is barred from recovering from the United States under section 107(a) because the government "has already paid its share" of cleanup costs, so cost collection under CERCLA would be inequitable under section 113(f). Answer, J.A. 197

The government moved for partial summary judgment on its section 114(b) double-recovery defense, and Lockheed cross-moved on the same issue for judgment on the pleadings. In September 2009, the district court ruled in favor of Lockheed on both motions. *See Lockheed Martin Corp. v. United States* (*Lockheed I*), 664 F. Supp. 2d 14 (D.D.C. 2009). The court concluded that section 114(b) does not bar Lockheed's CERCLA claim. *See id.* at 18-20. The court explained that, "[p]ursuant to the FAR," the government indirectly pays contractors "costs that are not associated with a specific contract—essentially, overhead," such as the cleanup costs at

issue here. *Id.* at 16. The court rejected the government's section 114(b) defense on the ground that the indirect-cost payments for environmental response did not amount to "compensation . . . pursuant to . . . Federal . . . law" within the meaning of section 114(b). *Id.* at 18-19. That was because "the government-as-client's indirect cost payments are not made in recognition of, or in compensation for, the government's CERCLA liability for those response costs." *Id.* at 19.

The court specifically recognized that Lockheed's indirect-cost charges would be reduced if some of the liability were apportioned to the government under CERCLA: If it were determined that "Lockheed is only partially liable for the response costs it is incurring at the Site, it should not have to include all its response costs in the [DiscOps] Pool," and a CERCLA judgment against the government would limit Lockheed "in its dealings with the government-as-client" to charging as contract overhead "only . . . those costs for which it [Lockheed] is actually liable." *Id.* at 20. The court's anticipation that any CERCLA recovery would be excluded from the DiscOps pool tracked its understanding of these same parties' coordination of CERCLA and indirect-cost payment under an earlier settlement, when the government paid Lockheed "directly for a percentage of the response costs incurred," and "that portion of the costs was excluded from the [DiscOps] pool, to ensure that Lockheed did not recover the same costs twice." *Id.* at 17. The court further reasoned that, even if costs that CERCLA assigned to the government were charged to the DiscOps pool, the FAR's crediting requirement, reinforced by the crediting requirement in the Billing Agreement, would as a practical matter prevent any double recovery or other windfall to Lockheed. *Id.* at 19-20.

The court denied the government's motion for reconsideration. It rejected the government's argument that it had paid costs "pursuant to" federal "law" within the meaning of section 114(b). Although the FAR are federal law, the court held, the contracts pursuant to which the government paid Lockheed's indirect costs are not.

Before trial of Lockheed's CERCLA claim, the government stipulated that Lockheed had incurred response costs for cleanup at the three facilities, and both parties stipulated that they were liable as PRPs under section 107(a), leaving for disposition only the question of what share of liability each bore. When the originally assigned trial judge retired, the case was transferred to another judge. The new judge presided over a twelve-day bench trial, which she characterized as a "battle of the experts" on numerous issues. *Lockheed II*, 35 F. Supp. 3d at 119. Most of the trial evidence pertained to contamination at the three sites and the extent to which each party bore responsibility for that contamination, *id.*, issues not challenged in this appeal, *see* Br. of Appellant United States 25, 45. The parties also spent "a significant amount of trial" on the accounting issues surrounding Lockheed's indirect-cost billing and crediting. *Id.* at 119. On those issues, the court received testimony of four experts—two for each party—as well as testimony of Lockheed's vice president of government finance. *Id.* at 119-20.

In April 2014, the court issued a comprehensive memorandum opinion apportioning liability between the United States and Lockheed. *See Lockheed II*, 35 F. Supp. 3d 92. Beginning from a baseline allocation following "the per capita approach: a fifty-fifty split between Lockheed and the government," *id.* at 132, the court made a "traditional equitable allocation" in light of the equitable factors often employed by courts to assign responsibility and corresponding CERCLA

liability, *id.* at 122-24, 132-53.  The court found that, although Lockheed had exercised significantly more control than the government over the day-to-day disposal of hazardous waste at the facilities, the government had acquiesced in some of Lockheed's disposal operations, to varying extents at each facility, and thus bore a fraction of responsibility for the contamination. *See id.* at 150-51.  The court allocated liability as follows:  at the Redlands facility, a 30 percent share of liability for the government and a 70 percent share for Lockheed; at the Potrero Canyon facility, a 25 percent share for the government and a 75 percent share liability for Lockheed; and at the LaBorde Canyon facility, a 20 percent share for the government and an 80 percent share for Lockheed. *Id.* at 153.

Next, the court addressed as an equitable matter the issue of Lockheed's indirect-cost recovery, in light of which the government contended that any judgment against it under CERCLA would yield double recovery.  *Id.* at 153-62.  Recognizing "the narrowness of the statutory [section 114(b)] bar on double recovery," the court explained, "courts have developed a broader *equitable* double recovery theory" under section 113(f) to prevent a CERCLA judgment from granting a windfall to the plaintiff.  *Id.* at 154-55.  The court found that Lockheed had already indirectly recovered from the government, through overhead charges on ensuing contracts, more than 72 percent of the response cost incurred to date for the three facilities.  *Id.* at 154.  Thus, the court determined that, with regard to the portion of the cleanup that had been completed, "the government's 'effective share' is already well over two times higher than its [20 to 30 percent] equitable share."  *Id.*

The court noted that a CERCLA judgment against the United States would not award Lockheed double recovery "in the traditional sense."  *Id.* at 155.  Even if the court were to

require the government to pay Lockheed under CERCLA for costs it had already reimbursed under the Billing Agreement, the trial judge, like the judge who had ruled on the pretrial motion under section 114(b), noted that FAR's crediting mechanism would require Lockheed to credit any CERCLA recovery for those costs to the DiscOps Pool, and that such credits would be passed through to Lockheed's contracts in the same way as costs. *Id.* Thus, Lockheed could not be left with more in response costs than it initially paid.

Notwithstanding its rejection of the government's equitable double-recovery defense, the district court in its equitable allocation under section 113(f) found that Lockheed had received substantial economic benefits from charging environmental cleanup as an indirect cost in its government contracts over the preceding two decades. *Id.* at 156-57. The court excluded from the government's share of liability for past costs the more than $18 million in prejudgment interest that the government would otherwise owe on its CERCLA liability. *See* 42 U.S.C. § 9607(a). It did so because Lockheed had already charged the government's cleanup costs as contract overhead, and so had use of the funds at issue during the relevant period. *See Lockheed II*, 35 F. Supp. 3d at 159-60. Lockheed also had charged through the DiscOps Pool the more than $10 million in attorney's fees and costs it incurred in bringing the CERCLA action. *Id.* at 161. Because CERCLA does not authorize collection of such costs, *see Key Tronic Corp. v. United States*, 511 U.S. 809, 819 (1994), the court concluded, a further equitable reduction in the government's share was warranted, *see Lockheed II*, 35 F. Supp. 3d at 161. Additionally, the court found that Lockheed had received significant excess economic benefit from its application of a profit factor on the response-costs increment of its indirect contract charges. *Id.* at 157-59. Finally, the district court found that, with respect to both past

and future costs, Lockheed received some excess benefit from its collection of cleanup costs through its fixed-price contracts. *Id.* at 160-61. For those reasons, the district court allocated 100 percent of already-incurred response costs to Lockheed, reducing to 0 percent the government's share of those past costs. *Id*. at 161.

The court found that, going forward, Lockheed would as a transitional matter benefit from fixed-price contracts that it had priced with reference to 100 percent of cleanup costs. *Id.* at 162. Because Lockheed had many such contracts that remained in effect for several years after the court limited Lockheed's actual share of future response costs to a maximum of 81 percent, the court made a 1 percent reduction to the government's overall share of the entire future-cost liability. *Id.*

Thereafter, the parties stipulated to a process for payment of future costs. *See* Joint Stipulated Order Regarding Payment of Future Costs (Dkt. No. 158), *Lockheed II*, 35 F. Supp. 3d 92 (No. 1:08-cv-10060). Under their post-judgment agreement, every six months Lockheed will make a written demand to the United States for payment of the government's equitable share of response costs Lockheed incurred during the preceding six-month period. *Id.* ¶¶ 2(a), 3(a)-(e). The government will pay that amount within 120 days of receiving Lockheed's demand, less any amount it disputes. *Id.* ¶ 3(f)-(g). Lockheed and the United States further agreed that Lockheed "will follow its current disclosed and established practices including . . . all applicable requirements under the Federal Acquisition Regulation, the Cost Accounting Standards, and the requirements of the [Billing Agreement], with respect to environmental remediation costs and credits for the sites under the Federal Contracts." *Id.* ¶ 6. The government timely appealed.

17

II.

## A. Standard of Review

In contribution actions under CERCLA section 113(f), the district court has significant discretion to "allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1); *see PCS Nitrogen Inc. v. Ashley II of Charleston LLC*, 714 F.3d 161, 186 (4th Cir.), *cert. denied*, 134 S. Ct. 514 (2013). Courts "have described the district court's authority in this area as 'broad and loose.'" *NCR Corp. v. George A. Whiting Paper Co.*, 768 F.3d 682, 695 (7th Cir. 2014) (quoting *Browning-Ferris Indus. of Ill., Inc. v. Ter Maat*, 195 F.3d 953, 957 (7th Cir. 1999)). "CERCLA not only entrusts the district court to make the ultimate equitable allocation of costs, but it also grants the court the authority to decide which equitable factors will inform its decision in a given case." *Id.*

We do not simply "rubber-stamp" a district court's equitable allocation, *id.* at 696, but review it for abuse of discretion, *see Agere Sys., Inc. v. Advanced Envtl. Tech. Corp.*, 602 F.3d 204, 216 (3d Cir. 2010); *United States v. Consolidation Coal Co.*, 345 F.3d 409, 412 (6th Cir. 2003); *Boeing Co. v. Cascade Corp.*, 207 F.3d 1177, 1187 (9th Cir. 2000); *cf. Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1207 (D.C. Cir. 2004) ("We review the district court's decision whether to grant equitable relief only for abuse of discretion."). "An abuse of discretion occurs when the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *Agere Sys., Inc.*, 602 F.3d at 216 (internal quotation marks and citations omitted). In the equitable allocation context, we ask "(1) whether the district court failed to consider a relevant factor that should be been given significant weight; (2) considered and

gave significant weight to an irrelevant or improper factor; or (3) considered all proper factors and no improper ones, but in weighing those factors, committed a clear error of judgment." *K.C. 1986 Ltd. P'ship v. Reade Mfg.*, 472 F.3d 1009, 1017 (8th Cir. 2007) (internal quotation marks omitted).

We review de novo the district court's grant of Lockheed's motion for judgment on the pleadings and its denial of the United States' motion for partial summary judgment. *See Defenders of Wildlife v. Gutierrez*, 532 F.3d 913, 918 (D.C. Cir. 2008); *Thomson v. Dist. of Columbia*, 530 F.3d 914, 915-16 (D.C. Cir. 2008).

## B. Analysis

The United States has played two roles relevant to this appeal: The federal government is (1) Lockheed's primary source of ongoing business, and (2) a partially responsible party under CERCLA with a legal duty to pay its share of the cleanup costs. The United States voluntarily assumed the first role, agreeing to pay the Company higher prices on unrelated goods and services to reimburse Lockheed for its environmental cleanup costs. Although the government initially had resisted such charges, its 2000 Billing Agreement with Lockheed authorized the Company to include as routine contract overhead on any new contracts a charge for remediation of past environmental contamination at its discontinued operations, including the three sites at issue in this case. Billing Agreement ¶¶ 1.8, 2.4-2.5, 2.8, J.A. 566, 568-69. The United States does not here dispute that by this arrangement it agreed to reimburse Lockheed's own share of the cleanup costs. *See* Br. of Appellant United States 54; Reply Br. 1, 18; *see also* Oral Arg. Rec. 13:30-14:00, 15:30-16:00. In its second role, the government stipulated that it bore partial responsibility for causing the environmental damage at the sites, and is therefore

obligated by CERCLA to pay its own proportionate share of the cleanup costs. Each party admittedly contributed to the problem; what Lockheed and the United States dispute on appeal is how they will pay to remedy it.

Lockheed filed suit in 2008, asking the court to identify and order the United States to pay the government's share as a PRP under CERCLA. Neither party challenges the district court's percentage allocation of responsibility following trial or any of the district court's detailed factual findings. Nor do the parties contest the district court's decision in the exercise of its equitable powers to reduce the government's share to 0 percent for past costs, and to reduce by 1 percent the 20 to 30 percent responsibility the court initially allocated to the government for future costs.

The only issue raised on appeal is whether the United States must pay under CERCLA the 19 to 29 percent of the post-judgment response costs the district court awarded to Lockheed. The United States contends that its contractual payments already fulfilled its CERCLA obligation. It presses two CERCLA defenses that it says should have completely barred Lockheed's recovery in this case, even for response costs yet to be incurred. It invokes CERCLA section 113(f), which requires courts to apply equitable principles to prevent excess recovery in allocating response costs between liable parties. 42 U.S.C. § 9613(f). The government claims the district court should have exempted it from all liability against it under CERCLA, given that it has already paid far more than its equitable share, and Lockheed far less. The government also relies on CERCLA section 114(b), which bars recovery of "the same removal costs" by any party that has already received "compensation for removal costs" if such compensation was made "pursuant to any other Federal or State law." 42 U.S.C. § 9614(b). The

government contends it already compensated Lockheed "pursuant to" federal government contracting law.

Each of the government's theories boils down to an objection against double recovery. If the government were to pay what is at most a 29 percent CERCLA share of the approximately $124 million in estimated future costs, its total CERCLA exposure for the future cost portion at the end of the cleanup would be approximately $36 million. Even adding the past costs, for which the court allocated the government a 0 percent share in light of its payments to date, a 29 percent share of the estimated overall total of $411 million would not exceed $120 million. And yet, as noted above, the government has already paid out $208 million via contract overhead—before paying the CERCLA judgment from which it now appeals. Stated another way, the government emphasizes, it "has already paid 55 percent of the total past and future response costs that Lockheed is expected to incur," Br. of Appellant United States 23, and even absent a CERCLA judgment, it will eventually pay 83 percent of total response costs at the site—well above its court-allocated equitable share of only 19 to 29 percent of future costs incurred in cleaning up the three sites, *id.* at 43-44. The crediting mechanism in the Billing Agreement would not fix the problem, the government maintains; as 87 percent of Lockheed's customer base, the United States would only receive 87 percent of any credited CERCLA award while 13 percent would inure to the benefit of other Lockheed customers. The government reasons that, because it has already paid more than its share and *any* additional payment would increase its effective share even further, it should not have to pay more.

Lockheed counters that neither defense holds water. It insists that there is no possibility of double recovery as either an equitable or a statutory matter, because the Billing Agreement's

crediting mechanism would require any CERCLA recovery from the government to be credited back to Lockheed's customers, more than offsetting the government's payments toward those costs. Section 114(b) poses no bar, Lockheed contends, because indirect-cost payments for unrelated goods and services pursuant to contract do not constitute "compensation for removal costs pursuant to . . . Federal law."

1. The United States' primary equitable argument, with which we begin, has some intuitive appeal. Under CERCLA, to the extent that the government did not cause the pollution, taxpayers should not be "required to shoulder the financial burden" of environmental cleanup. *B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1198 (2d Cir. 1992). In its uncontested, careful, and detailed analysis of the parties' relative responsibility for the contamination at the site, the district court concluded that Lockheed—*not* the government—was largely responsible. *Lockheed II*, 35 F. Supp. 3d at 132-53. One would think, then, that Lockheed—*not* the taxpayers—would shoulder the lion's share of the costs. But, as described above, that is not what is happening. The government has indirectly paid the vast majority of past cleanup costs, and Lockheed will continue to bill its own remediation costs to its current and future contracts—principally federal government contracts—until Lockheed is fully reimbursed. All the while, Lockheed has maintained an extraordinarily lucrative business dominated by U.S.-government contracting, with strong cash generation, record earnings and profit margins, and exceptional stock performance since the cleanup began. *Id.* at 141 & n.66; *see* Consolidated Statement of Earnings, Lockheed Martin Corporation Annual Report (2012) at 55, J.A. 554.

A taxpayer might reasonably ask whether it makes sense for the government to play both roles identified by the district court

here—that of a contracting party paying the majority of Lockheed's unrelated remediation costs and that of a PRP with a share of CERCLA liability—or whether instead it should play just one role. The government has long since paid for the rockets Lockheed built. And CERCLA's liability-allocation provisions are not designed to provide a government-funded cleanup program, but to assign environmental response costs proportionally to the parties responsible for causing them. It is not obvious how it comports with CERCLA's basic principle of making responsible parties internalize the costs of their pollution that Lockheed (1) profits mightily from its defense contracting business, and (2) passes through to the taxpayer its share of the environmental harm it wreaked. It might seem more sensible for Lockheed to have to charge its own corporate surplus, not the United States taxpayer, for its own CERCLA share of response costs. At the end of the day, the government laments, Lockheed internalizes none of the costs associated with the remediation of the hazardous waste sites its business created, and the decision of the district court does nothing to change that.

Contrary to the government's claim, however, in the circumstances of this limited appeal, we, too, are powerless to shift Lockheed's share of the removal costs from the taxpayer back onto the Company. To be sure, there is ample authority for the government's basic proposition that the law forbids a polluter like Lockheed from recovering from the government twice for the same environmental response costs. CERCLA, the Federal Acquisition Regulations, the parties' own Billing Agreement, and the district court's final judgment in this case are unanimous on the point: No party may lawfully demand double recovery of the money it spent cleaning up hazardous waste. *See* 42 U.S.C. § 9614(b); 48 C.F.R. §§ 31.201-5, 52.216-7(h)(2); Billing Agreement ¶ 4.7, J.A. 572; *Lockheed II*, 35 F. Supp. 3d at 154-55. And, as the district court recognized,

*Lockheed II*, 35 F. Supp. 3d at 154-55, courts have invoked principles of equity under section 113(f) to bar CERCLA relief where double recovery would otherwise result, even in circumstances in which further recovery is not barred by CERCLA section 114(b). *See, e.g.*, *Litgo New Jersey Inc. v. Comm'r of the N.J. Dep't of Envtl. Prot.*, 725 F.3d 369, 391 (3d Cir. 2013) (holding equitable allocation must be offset by settlements); *Friedland v. TIC-The Indus. Co.*, 566 F.3d 1203, 1206-07 (10th Cir. 2009) (holding equitable allocation must be offset by amount plaintiff received from insurance settlements); *K.C. 1986 LP*, 472 F.3d at 1017 (holding settlement credits "present a significant allocation factor" under CERCLA); *Akzo Nobel Coatings, Inc. v. Aigner Corp.*, 197 F.3d 302, 307-08 (7th Cir. 1999) (holding equitable allocation must be offset by settlement credits); *Yankee Gas Servs. Co. v. UGI Utils. Inc.*, 852 F. Supp. 2d 229, 255-56 (D. Conn. 2012) (holding equitable allocation must be offset by insurance payments); *Basic Mgmt. Inc. v. United States*, 569 F. Supp. 2d 1106, 1122-23 (D. Nev. 2008) (holding equitable allocation must be offset by insurance payments). It is well settled that "any level of double recovery is inequitable in CERCLA contribution actions." *NCR Corp.*, 768 F.3d at 708.

But here, the district court's CERCLA judgment did not create any double recovery. The reason the government will end up paying far more than its own 19 to 29 percent share of future costs is that it voluntarily agreed to let Lockheed pass through its share, too. It was the government's choice to accept the Billing Agreement, authorizing Lockheed to assign to the DiscOps Pool and charge as indirect contract costs certain cleanup costs relating to facilities at which Lockheed had discontinued operations prior to December 31, 1999. Billing Agreement ¶¶ 1.7-1.8, 2.4-2.5, 2.8, 2.13, 4.3, J.A. 566-70. The Billing Agreement specifies that itemized environmental remediation

costs, as well as myriad other costs incurred by the company related to discontinued facilities, *id.* ¶ 1.8, J.A. 566-67, "will be recognized and reimbursed and treated as allowable and allocable costs between the parties," *id.* ¶ 2.5, J.A. 568.

That settlement required the government to pay *all* past cleanup costs Lockheed incurred at the specified sites (except for the small portion Lockheed passed through its few contracts with other customers). Indeed, the government does not dispute that it agreed in the parties' 2000 Billing Agreement to pay even Lockheed's share of the remediation costs. It acknowledged in its briefing to this court that "[t]he consequence of the government's execution of the [Billing] Agreement . . . was that it likely would pay a much higher share of Lockheed's response costs than it would bear under an equitable allocation." Br. of Appellant United States 54; *see also, e.g.*, Reply Br. 1 ("The United States does not complain here about the price of its contracts, even though its payment of indirect contract costs for Lockheed's cleanup far exceeds its equitable share of those costs."). At oral argument the government conceded that, by operation of the Billing Agreement, at the end of the day it will pay nearly 100 percent of the response costs incurred at the sites, whether through indirect payments alone or through a combination of indirect payments and a CERCLA judgment. Oral Arg. Rec. 15:30-16:00; *see also* Oral Arg. Rec. 13:30-14:45 (government counsel noting that the government does not contest the validity, or seek reimbursement, of the indirect-cost payments it made to Lockheed in excess of the government's share of liability). Given the government's decision to enter the Billing Agreement to reimburse Lockheed's share of cleanup costs together with its CERCLA liability setting its own share, the *only* portion of the cleanup bill the government will not foot is the relatively small portion paid by Lockheed's other customers.

The extent of the government's payment thus results from the government's own choice. Even after the government pays its percentage of the future remediation bills, it will still be left paying the vast majority of Lockheed's proportionate share in addition to its own. But the government agreed to that consequence by entering a settlement that allowed Lockheed in its new contracts to charge the government for the company's own CERCLA liability at the discontinued sites. Like the district court, we are in no position to "save the government from the natural and probable consequences of its own conduct." *Lockheed II*, 35 F. Supp. 3d at 156. Indeed, given that our review of the district court's equitable judgment is for abuse of discretion, we are even more powerless than the district court to do so.

2.    Also unavailing is the government's protest that the crediting mechanism does not help, but instead harms it further. Lockheed insists that the government has no ground for any double-payment concern, because the government will soon get back its CERCLA payment. After all, says Lockheed, the governent's CERCLA payment will be credited to the DiscOps pool. But the government is unmoved, pointing out that Lockheed's other customers get a portion of any credit to the DiscOps pool. In particular, the United States asserts, it would only receive 87 percent of any credited CERCLA award, while 13 percent would benefit Lockheed's other customers.

As an initial matter, we note that nothing in the FAR, the DCAA Manual, the Billing Agreement, or the District Court opinions requires the parties to funnel the now-established *governmental* share of future response costs through the DiscOps pool. In fact, the Audit Manual notes that "environmental laws usually require each [PRP] for contamination at a site to be individually liable for the complete

clean-up of the site" and specifically states that "[t]he allowable environmental cost should *only include the contractor's share* of the clean-up costs based on the actual percentage of contamination attributable to the contractor." DCAA AUDIT MANUAL § 7-2120.9(a), J.A. 496 (emphasis added). The parties have not identified any authority for using the Billing Agreement's indirect-cost billing-and-crediting process for anything beyond Lockheed's share. Now that the district court has set the parties' relative shares of responsibility, it is unclear why the government would not simply pay its share of CERCLA liability directly to Lockheed as Lockheed incurs remediation costs.

Nothing in the district court's judgment requires that the government's CERCLA payments be routed through the DiscOps pool. In rejecting the government's section 114(b) defense, the court observed that, "[i]f Lockheed is only partially liable for the response costs it is incurring at the site, it should not have to include all its response costs in the Settled [DiscOps] Pool." *Lockheed I*, 664 F. Supp. 2d at 20. Instead, the court explained, "Lockheed may recover separately under CERCLA from the government-as-PRP . . . , burdened in its dealings with the government-as-client only by those costs for which it is actually liable." *Id.*; *see also Lockheed II*, 35 F. Supp. 3d at 117.

Similarly, the district judge who made the post-trial equitable-allocation decision noted that, "pursuant to a declaratory judgment in this case, the government should reimburse Lockheed for its response costs as those costs are incurred." *Lockheed II*, 35 F. Supp. 3d at 162. The court contemplated that the government's direct CERCLA payments to Lockheed would, in all likelihood, predate and be wholly separate from any post-judgment indirect-cost contract payments to cover Lockheed's share. *See id.* at 161 n.97. The court made

clear that it did not expect—let alone require—Lockheed to charge the government's share to future contracts as indirect costs nor credit the government's CERCLA payment to the DiscOps pool. Indeed, it pointed out that in some ways Lockheed would be "worse off following a direct CERCLA recovery from the government because it loses profits [on that portion of its overhead charges] that it would otherwise earn if those costs were allocated to contracts . . . through the [Billing Agreement]." *Id.* at 162. Were the parties to take the straightforward approach set forth in the Audit Manual and contemplated by the district court, the government would reimburse only Lockheed's share through indirect-cost contract payments, paying its own share directly as the costs are incurred. In that event, the 13 percent loss of which the government complains would not occur.

But here, again, only the government's own choice appears to constrain its path forward. Nothing in the district court's decision requires the parties to use the DiscOps pool to charge out the *government's* share of future costs; the parties appear to be using that system solely because of their Billing Agreement, extended by their post-judgment stipulation. As the district court explained, "[b]ecause the [government's] CERCLA allocation payment for a given year's response costs would predate Lockheed's indirect recovery for those costs through government contracts, the [Billing Agreement]—and not the CERCLA allocation for future costs—is the source of the government's rub." *Id.* at 161 n.97. Although the Billing Agreement by itself does not appear to mandate the approach of which the government now complains, the parties did not elect any different payment system in their post-judgment, stipulated order regarding payment of future costs. *See* Joint Stipulated Order Regarding Payment of Future Costs (Dkt. No. 158) ¶ 6, *Lockheed II*, 35 F. Supp. 3d 92 (No. 1:08-cv-10060). The loss

to the government from the crediting process is not a result of the judgment of the district court; it is a problem of the government's own making.

3. Even assuming we were in a position to review the equities of the parties' own choice in their Billing Agreement to resort to the indirect-cost billing and crediting mechanism and their apparent decision to use that mechanism for payment and crediting of future costs, the government has not clearly identified how the crediting mechanism is a source of inequity. As the district court explained, the FAR and the Billing Agreement, where they apply, require Lockheed to credit any CERCLA recovery to the DiscOps Pool and to assign credits to Lockheed's contracts in the same way as costs. *Lockheed II*, 35 F. Supp. 3d at 111-12, 154-55 (citing Settlement Agreement ¶ 4.7, J.A. 572, and Trial Testimony of Robert Gatchel, Vice President of Government Finance, J.A. 448). Under the Billing Agreement, Lockheed does not bill the government directly. Instead, it first charges all remediation costs to contract overhead. It then must credit back to its contracting customers any CERCLA recovery it receives. In that respect, this case is similar to those in which courts have declined to reduce a utility's equitable allocation based on its collection of those same costs through rates, where a utility that previously charged its customers costs of remediation must later reduce its prices by any CERCLA judgment the utility received to cover those costs. *See Yankee Gas Servs. Co.*, 852 F. Supp. 2d at 255; *see also N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp.*, 808 F. Supp. 2d 417, 528-29 (N.D.N.Y. 2011), *aff'd in part, vacated in part, remanded*, 766 F.3d 212 (2d Cir. 2014). The district court acted within its sound discretion in concluding that Lockheed ultimately would not twice recover the government's share of CERCLA response costs.

Moreover, it is apparent that the government will not have paid *its* 19 to 29 percent equitable share more than once. Based on evidence presented at trial, the district court found that Lockheed had recovered from the government through higher contract prices more than 72 percent of the total of its past response costs for the sites, a figure anticipated to rise to an average of approximately 83 percent because the government now represents a larger share of Lockheed's business than it did in the past. *Lockheed II*, 35 F. Supp. 3d at 113, 154. The court also found that the government will receive through credits the benefit of only 87 percent of any CERCLA judgment the government pays Lockheed. *Id.*

The government cites these findings to support its contention that it only will *receive* 87 percent of its CERCLA judgment through the crediting mechanism. Br. of Appellant United States 52-53. However, that contention ignores the court's first finding. Because the government only pays as indirect costs, or contract overhead, a percentage of response costs corresponding to its percentage of Lockheed's business at a given time, it will only have *paid* a commensurate percentage of the total response costs, including only a percentage of its own proportionate share of the future response costs. *Lockheed II*, 35 F. Supp. 3d at 113, 154. The government has not shown how it would be inequitable to credit to the government 87 percent of its CERCLA payments after the government will have paid only a similar percentage of the corresponding costs through indirect-cost contract payments.

The government's only retort is that it should not be required to pay anything beyond its 19 to 29 percent share of liability, because it has already paid 83 percent of the overall remediation costs. Br. of Appellant United States 43-44, 50. As discussed above, that argument contests not overpayment

beyond the government's equitable share under CERCLA, but the consequence of the government's own decision to pay *Lockheed*'s share pursuant to the Billing Agreement. We therefore conclude that the district court did not abuse its discretion in declining to eliminate the government's share of liability on the basis of an equitable double-recovery theory.

4. Finally, the United States has appealed from the district court's pretrial ruling rejecting the government's claim that section 114(b) altogether bars Lockheed's CERCLA claim. In view of the district court's final judgment and the government's failure to identify how that decision imposes any double liability or double recovery, however, we need not delve into the parties' textual and purposive section 114(b) arguments. At this juncture, on appeal from the district court's judgment imposing no liability on the government for past costs, section 114(b) simply is not implicated. The only costs the government has already paid are indirect-cost contract payments covering the bulk of past costs Lockheed incurred cleaning up the sites. *Lockheed II*, 35 F. Supp. 3d at 113. But the district court exercised its equitable discretion to reduce the government's share to 0 percent of past costs, *id.* at 162, and that decision remains unchallenged. The judgment simply does not impose on the government any risk of paying those past costs again. The government's CERCLA payments for its 19 to 29 percent of future costs will not be "for the same removal costs" within the meaning of section 114(b) as those already paid, and thus do not implicate that section's double-recovery bar. 42 U.S.C. § 9614(b).

With respect to future costs, as discussed above, nothing in the FAR, the DCAA Manual, the Billing Agreement, or the District Court opinions requires the parties to employ the Billing Agreement's indirect-cost billing-and-crediting process for

anything more than Lockheed's share, now that the parties' shares have been established. We therefore decline to evaluate the interplay of federal contracting law and section 114(b), an issue of first impression in the courts of appeals. We need not pass on that question here.

\* \* \*

For the foregoing reasons, we affirm the judgment of the district court.

*So ordered.*